CHEMICAL PRODUCTS CORP., Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 84–9–01321.

United States Court of International Trade.

Sept. 26, 1986.

Gibson, Dunn & Crutcher (Joseph H. Price and Robert M. Kruger), Washington, D.C., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Dept. of Justice (A. David Lafer), Washington, D.C., for defendant.

*Memorandum Opinion and Order*

DiCARLO, Judge:

Chemical Products Corporation (CPC), a domestic producer of barium carbonate, challenges a final determination by the United States Department of Commerce, International Trade Administration (Commerce) that barium carbonate from the People's Republic of China (PRC) is being sold in the United States at not less than fair value. *Barium Carbonate from the People's Republic of China,* 49 Fed.Reg. 33,913 (1984). The action is remanded since Commerce's allocation of factors production to hydrogen sulphide gas, a product created during the production of barium carbonate, is not supported by substantial evidence in the record or in accordance with law.

## I. BACKGROUND

Commerce determined that barium carbonate from the PRC is being sold in the United States at not less than fair value. Plaintiff seeks review of Commerce's final determination pursuant to section 516A(a)(2)(A) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A) (1982 & Supp. II 1984). The question presented is whether the following determinations by Commerce are supported by substantial evidence and in accordance with law:

1) The construction of foreign market value based on factors of production valued in Thailand under 19 U.S.C. § 1677b(c)(2) (1982 & Supp. II 1984) and 19 C.F.R. 353.8 (1984);

2) The use of weighted average factors of production using data from two Chinese barium chloride plants under the verification and best information available require-

ments, 19 U.S.C. § 1677e, and 19 C.F.R. § 353.1;

3) The use of the minimum eight percent profit factor in calculating foreign market value under 19 U.S.C. § 1677b(e)(1)(B)(ii) and 19 C.F.R. § 358.8(c);

4) The allocation of factors of production between barium carbonate and hydrogen sulphide gas on a quantity basis rather than on the value of the respective products.

## II. DISCUSSION

In reviewing a determination by Commerce, the standard of review is not *de novo*. Rather, the Court must determine whether the challenged determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). Under this standard the Court must accept Commerce's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Federal Trade Commission v. Indiana Federation of Dentists*, — U.S. —, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986). Substantial deference is granted to the agency in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law. *See American Lamb Co. v. United States*, 785 F.2d 994 (Fed.Cir.1986); *Carlisle Tire & Rubber Co. v. United States*, 9 CIT —, 622 F.Supp. 1071 (1985).

### 1. Constructed value

Since the PRC has a state-controlled-economy, its sales of barium carbonate cannot be used to determine foreign market value under 19 U.S.C. § 1677b(a). Rather, foreign market value is determined by selecting an appropriate non-state-controlled economy and determining the prices or the constructed value of barium carbonate or similar merchandise in that country. *See* 19 U.S.C. § 1677b(c); 19 C.F.R. § 353.8(a). Commerce constructed the foreign market value of the merchandise based on factors of production valued in Thailand under sec-

tion 1677b(c)(2). Commerce's final determination states:

After analysis of countries which produce barium carbonate we determined that India would be the most appropriate surrogate selection. However the Indian government declined to participate in the investigation. When we determined that there was no other country which manufactures barium carbonate and which is at a comparable economic level as the PRC, we inquired whether there is a product which is such or similar (as defined in section 771(16) of the Act) to the PRC barium carbonate.

Based on available information, we did not find any product that could be considered such or similar merchandise within the meaning of the Act. Therefore, pursuant to section 773 of the Act, and § 353.8(c) of the Commerce Regulations, we proceeded to construct a value based on specific components or factors of production in the PRC, valued on the basis of prices and costs in a non-state-controlled-economy "reasonably comparable" in economic development to the PRC. After analyzing those non-state-controlled-economies most similar to the PRC, we concluded that Thailand was a comparable economy for valuation of the PRC factors of production.

49 Fed.Reg. at 33,914.

Plaintiff says that Commerce should have used home market sales prices of barium carbonate in Mexico to determine foreign market value. It contends that Commerce was required to use Mexican prices for these reasons: (1) 19 C.F.R. § 353.8 establishes a hierarchy under which foreign market value in a state-controlled economy must be determined by the prices at which such or similar merchandise is sold for consumption or export in a non-state-controlled economy, if such price information is available; (2) even if the regulation does not establish a hierarchy in all cases, it establishes a preference for prices over constructed value when price information is readily available from a cooperating non-state-controlled economy; and (3) Com-

merce policy and practice dictates that price information be used instead of constructed value when price information is readily available. The Court disagrees.

In determining foreign market value in a state-controlled economy, the antidumping law allows the determination to be made on the basis of either prices or constructed value. 19 U.S.C. § 1677b(c).

While no preference for prices over constructed value is expressed in the statute, 19 C.F.R. § 353.8(a) (1984) states:

foreign market value shall be determined on the basis of the normal costs, expenses, and profits as reflected *in order of preference by either:*

(1) The prices, determined in accordance with §§ 353.3 or 353.5, at which similar merchandise produced in a non-state-controlled-economy country or countries is sold either: (i) For consumption in the home market of that country or countries, or (ii) to other countries, including the United States; or

(2) The constructed value of such or similar merchandise in a non-state-controlled-economy country, determined in accordance with § 353.6 [emphasis added].

The regulation does not require Commerce to ascertain foreign market value in every instance where prices are available. Section 353.8(a) states that prices are the *preferred* method of establishing foreign market value. "As this Court recently held, failure to use a discretionary alternative method does not constitute error when the agency uses a lawful second method." *Carlisle Tire & Rubber Co. v. United States,* 622 F.Supp. at 1076 (citing *Zenith Radio Corp. v. United States,* 9 CIT ——, 606 F.Supp. 695, 698 (1985), *aff'd,* 783 F.2d 184 (Fed.Cir.1986)).

Plaintiff argues, however, that even if the statute and regulations do not establish a hierarchy requiring Commerce to use prices over constructed value in every instance, Commerce must follow the preference for prices in its regulation when price information is readily available from a cooperating non-state-controlled economy.

Plaintiff points out that such information was available since a Commerce case officer visited a Mexican barium carbonate plant and obtained home market pricing data and other information required for calculating foreign market value.

■ The Court finds that Commerce need not use prices to determine the foreign market value of merchandise from a state-controlled economy once a non-state-controlled economy makes price information available. Commerce's preference in favor of prices is tempered by its policy of ascertaining foreign market value by looking to *comparable* non-state-controlled economies:

(b) *Comparability of economies.* (1) The prices as determined under paragraph (a)(1), or the constructed value as determined under paragraph (a)(2), shall be determined, to the extent possible, from the prices or costs in a non-state-controlled-economy country or countries at a stage of economic development comparable to the state-controlled-economy country from which the merchandise is exported. Comparability of economic development shall be determined from generally recognized criteria, including per capita gross national product and infrastructure development (particularly in the industry producing such or similar merchandise).

19 C.F.R. § 353.8(b)(1).

In this case Commerce found that Thailand has an economy at a stage of development comparable to that of the PRC, whereas Mexico does not:

We found Mexico not to be a suitable surrogate for purposes of this determination because it is not at a stage of economic development comparable to the PRC. The only non-state-controlled economy country at a comparable level of economic development which manufactures barium carbonate is India, and India did not agree to cooperate in this investigation.

49 Fed.Reg. at 33,915.

A Commerce economist stated:

Mexico's per capita GNP is more than seven times that to China's (US $2,090 v. $290). Sixty-four percent of Mexico's labor force is engaged in the industrial and service sectors of the economy, with only thirty-six percent still in agriculture. By contrast, 71 percent of China's labor force is employed in the agricultural sector, with only 29 percent in industry and service. Sixty-seven percent of Mexico's total population resides in urban areas, while only 13 percent of China's total population does.

R. Doc. 51.

The Court does not agree that 19 C.F.R. § 353.8(b) may be applied by Commerce only in distinguishing between countries with available price data. Such an interpretation would render the constructed value provisions of section 353.8 meaningless except when no market economy produces the merchandise in question or is willing to cooperate in an investigation. Although 19 C.F.R. § 353.8(b)(2) provides a means by which Commerce may make adjustments to prices from a market economy which is at a different level of economic development than a home-market state-controlled economy, the regulation does not require that such adjustments be made, but grants Commerce discretion whether to make adjustments or to use constructed value to determine foreign market value.

The purpose of the statute's state-controlled-economy provisions is to arrive at the best estimate of foreign market value in the country of export. This purpose would be undermined if Commerce were prohibited from constructing a foreign market value based on factors of production in a country at a stage of economic development comparable to that of the exporting country whenever there exists a non-comparable producer country willing to supply price information.

The Court holds that Commerce may consider the comparability of economies before it determines whether to employ prices or constructed value as a means of determining foreign market value.

Plaintiff also contends that the decision by Commerce to construct foreign market value rather than to use Mexican prices is inconsistent with Commerce policy and practice. In *Carbon Steel Plate from Romania,* 47 Fed.Reg. 35,666 (1982) (Preliminary), 48 Fed.Reg. 317 (1983) (Suspension), Commerce used home market prices from Finland in determining the foreign market value of carbon steel plate from Romania after countries with economies comparable to Romania's refused to cooperate with Commerce's investigation. In *Natural Menthol from the People's Republic of China,* 46 Fed.Reg. 3258 (1981) (Preliminary), 46 Fed.Reg. 24,614 (1981) (Final), Commerce determined the foreign market value of a product from the PRC using home market prices from Paraguay rather than constructed value. This investigation is distinguishable, however, since Commerce found Paraguay's economy to be at a stage of economic development comparable to that of the PRC.

In contrast, plaintiff says that constructed value has been used only when no price data was available. For example, in *Unrefined Montan Wax from the German Democratic Republic,* 46 Fed.Reg. 38,555 (1981), Commerce stated:

Since there is no commercial production of unrefined montan wax in a non-state-controlled-economy country (other than the United States) and no such or similar merchandise, we constructed a value based on specific components or factors of production in the GDR, valued on the basis of prices in a non-state-controlled-economy country "reasonably comparable" in economic development to the GDR.

Defendant argues that past Commerce practice does not show that Commerce has always used available price information instead of constructed value. In *Chloropicrin from the People's Republic of China,* 48 Fed.Reg. 41,799 (1983) (Preliminary), 49 Fed.Reg. 5982 (1984) (Final), foreign market value was constructed even though price information was available from Japan and France. Plaintiff argues that use of

constructed value in the chloropicrin investigation was grounded on Commerce's finding that cost adjustments under section 353.8(b)(2) would prove impractical, whereas in the present case no finding of impracticality was made as to suitable adjustments to Mexican prices.

The Court finds that there is no practice which bars Commerce from exercising its discretion whether to use the preferred price method in determining foreign market value. Commerce may construct foreign market value or use suitably adjusted prices when it determines that the economies of countries willing to provide price information are not comparable to that of the country under investigation. Nothing in the investigations cited by plaintiff shows that Commerce has adopted a policy or practice which denies Commerce the discretion it has under the statute and the regulation to determine which method to use in determining foreign market value.

Even if Commerce were obligated to explain why it did not follow the approach used in a previous investigation, the record shows that Commerce did so. Commerce reviewed the *Romanian Steel Plate* investigation and determined that (1) the goal of ensuring a fair comparison between the state-controlled economy and the surrogate requires the comparison of comparable economies, (2) where a cooperating producer country with a comparable economy exists, price will be preferred over constructed value and (3) Commerce's decision in the *Romanian Steel Plate* investigation to use prices of a non-comparable surrogate in determining foreign market value was inconsistent with Commerce's policy of requiring comparability of economies and should not be followed. R.Doc. 129.

Since Commerce's use of constructed value for determining foreign market value is a reasonable exercise of discretion under the statute and the regulation, the determination of foreign market value on the basis of Chinese factors of production valued in Thailand is supported by substantial evidence and in accordance with law.

### 2. Best Imformation Available

In an antidumping investigation, Commerce is required to meet the verification and best information available requirements of 19 U.S.C. § 1677e (1982 & Supp. II 1984), which in pertinent part provides:

> The administering authority shall verify all information relied upon in making—
>
> (1) a final determination in an investigation
>
> . . . .
>
> If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, which may include, ... the information submitted in support of the petition.
>
> . . . .
>
> [W]henever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, [the administering authority shall] use the best information otherwise available.

Commerce's regulation, 19 C.F.R. § 353.-51(b)(1984), states in part:

> Whenever information cannot be satisfactorily verified, or is not submitted in a timely fashion or in the form required, the submitter of the information will be notified and the affected determination will be made on the basis of the best information then otherwise available which may include the information submitted in support of the petition.... Where a party to the proceeding refuses to provide requested information, that fact may be taken into account in determining what is the best available information.

In this case, Commerce requested data on the factors of production from two Chinese plants which produce barium carbonate in order to construct a foreign market value on the basis of weighted-average plant cost. One of the plants did not submit the requested information, and Com-

merce was obligated to look to an alternative source for the information. In its final determination Commerce stated:

Absent the requested information, we considered information developed on the factors of production of the significant producers in the contemporaneous anti-dumping investigation on barium chloride from the PRC. We determined the ratio of factors of production between the more efficient and less efficient producers of barium chloride and applied this ratio to the factors of production for the producer of barium carbonate that did provide information to calculate the factors of production for the non-responding plant. We then calculated a production-weighted average constructed value for the two plants. In employing this methodology, we assumed that the responding producer was the equivalent in efficiency to the more efficient barium chloride producer.

49 Fed.Reg. at 33,914–15.

Plaintiff contends that the best information rule was not satisfied by Commerce's examination of the relative efficiencies of barium chloride plants as an alternative source for the information not supplied by the barium carbonate plant since barium chloride and barium carbonate are distinct products. Plaintiff argues that the best information available for supplying the missing information was contained in the petition, and that under *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed. Cir.1984) and *Shop Towels of Cotton From the People's Republic of China,* 50 Fed. Reg. 26020 (1985) (Final), such information should be used when a party fails to supply requested information.

The best information rule does not compel Commerce to use data supplied by plaintiff. *See Zenith Radio Corp. v. United States,* 606 F.Supp. 695, 699 (1985), *aff'd,* 783 F.2d 184 (Fed.Cir.1986); *Carlisle Tire & Rubber Co. v. United States,* 622 F.Supp. at 1081. Neither the statute nor the applicable regulation requires Commerce to use information supplied by the plaintiff once an exporter or manufacturer has failed to comply with an information request from Commerce. The authorities cited by plaintiff stand for the proposition that information in the petition *may* be relied upon under the best information rule when the respondent does not cooperate in the investigation. *See Krupp Stahl AG v. United States,* 4 CIT 244, 553 F.Supp. 394, 395 (1982); 19 U.S.C. § 1677e; 19 C.F.R. § 353.15(b). Commerce may exercise discretion in determining what is the best information available when an exporter or manufacturer has failed to supply requested information.

Commerce considered the information contained in the petition, but the information relating to Chinese factors of production was based on United States values. A letter to a Commerce case officer from counsel to CPC reads:

Based on its own production expertise and its knowledge of conditions in China, Chemical Products Corporation ("CPC") has quantified the inputs of raw materials, energy, and labor that should be required for producing barium in China and *has valued these inputs at their cost in the United States.*

R.Doc. 34 (emphasis added). The use of the information contained in the petition would have been inconsistent with C.F.R. § 353.8(c), which requires that factors of production be valued and verified in a non-state-controlled-economy country "reasonably comparable in economic development to the state-controlled-economy country under investigation."

The record shows that Commerce's use of barium chloride data in determining the foreign market value of barium carbonate was based on similarities between the production processes of the chemicals, including similarities in major production stages, the use of identical raw materials, and the existence of mutual production-related problems. R.Doc. 39.

■ The Court holds that Commerce's use of information from an industry similar to the industry under investigation was a reasonable means of determining relative efficiencies among barium carbonate

plants. Commerce's use of barium chloride production data in its investigation is supported by substantial evidence and in accordance with law.

### 3. Profitability

In calculating a constructed foreign market value for the merchandise, Commerce is directed by statute to include:

> an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—
>
> . . . .
>
> (ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost.

19 U.S.C. § 1677b(e)(1)(B)(ii); see 19 C.F.R. § 353.6(a)(2) (1984). In determining the profitability factor in a state-controlled-economy investigation, the profit formula is applied to producers in the surrogate country. 19 U.S.C. § 1677b(c)(2); 19 C.F.R. § 353.8(a)(2).

Commerce surveyed four Thai chemical companies to determine a representative profitability percentage figure. Commerce found that during 1983 the companies showed profit margins of 20.40% (Company C), 8.82% (Company D), 0% (Company F), and 2.10% (Company G). Since these percentages resulted in an average profit of 7.85%, Commerce applied the minimum 8% profit factor as provided by statute.

Plaintiff argues that Commerce's determination is flawed in that the surveyed company showing no profit (Company F) "was suffering from special and unusual problems that made it [a]typical and unrepresentative of the chemical industry in Thailand." Brief for Plaintiff at 47. This company's financial problems were largely attributed to the shutting down of an old plant and the building of a new one. R.Doc. 134. Plaintiff asserts that if Company F had not been included in the survey, the average profitability of the remaining Thai chemical companies would have been 10.47 percent.

Although Company F's 1983 profitability percentage figure was atypical according to the Commerce case officer, the sampling was designed to gauge profitability within an industry, and it is not unreasonable to consider that some companies in an industry may replace production plants in any given year. Commerce's inclusion of Company F in its sampling offsets the unusually strong profit shown by Company C (20.49%) which was more than double the next most profitable company included in the sampling.

■ The Court holds that it was reasonable for Commerce to include in its sampling companies showing unusually high and low profitability margins in order to ascertain average profitability in an industry. Commerce's use of the minimum eight percent profit factor in calculating foreign market value under 19 U.S.C. § 1677b(e)(1)(B)(ii) and 19 C.F.R. § 353.8(c) is supported by substantial evidence and in accordance with law.

### 4. Allocation of Factors of Production

Commerce determined that the process in which barium carbonate is produced also yields an amount of hydrogen sulfide gas (HSG), and that a portion of the factors of production used in producing barium carbonate should be allocated to the production of HSG. As a result, foreign market value was lower than if Commerce had attributed to barium carbonate all of the factors of production used in barium carbonate production.

Plaintiff contends that (1) Commerce should not have allocated a portion of the factors of production to HSG since HSG is a noxious waste product, and (2) by basing its allocation on quantity without regard to the relative values of barium carbonate and HSG, Commerce improperly allocated too great a portion of the factors of production to HSG.

The record shows that barium carbonate and HSG are generated simultaneously in

the same production process. It also shows that HSG is used by the producing plants as a raw material input in the production of sulfur and sodium thiosulfate. Therefore, Commerce's finding that HSG is not a waste product is supported by substantial evidence and in accordance with law.

However, Commerce did not establish a commercial value for HSG nor did it establish the cost to the producer of obtaining a substitute input for producing sulfur and sodium thiosulfate, if HSG were not available. Although the final determination states that Commerce based its allocation on an analysis of the relative value of HSG to the plant, *see* 49 Fed.Reg. at 33,916, this statement is not borne out by the record. Instead, the record shows that Commerce treated barium carbonate and HSG equally, by allocating factors of production based on the quantity of each chemical yielded by the production process.

Under Commerce's reasoning, if the product produced were gold, and the process also yielded rocks which had no market value but were used for pavement at the plant, factors of production would be allocated between the gold and rock according to how much of each was produced. Such an allocation would obviously be unreasonable and not in accordance with law since it fails to take into account the disparate values of the products.

■ On this record, Commerce's allocation of factors of production is not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Federal Trade Commission v. Indiana Federation of*

*Dentists, supra,* 106 S.Ct. at 2015. It is not reasonable to allocate factors of production between barium carbonate and HSG on a quantity basis if the value of one product is significantly greater than the other. The Court holds that Commerce must find a reasonable means of ascertaining the market value of HSG or the value of HSG to the plant so that the record may show the respective values of barium carbonate and HSG. If the values of those products are not equal, Commerce must adjust its allocation of factors of production to reflect the difference in the value of the two products.

## III. CONCLUSION

Upon review of the record and Commerce's determination, the Court sustains Commerce's determination except with respect to its allocation of factors of production between barium carbonate and HSG. Commerce shall make any necessary adjustments in accordance with this opinion and file with the Court within 45 days a supplemental record explaining the adjustments made and the resulting margin. Plaintiff will file any comments on the results of the remand within 15 days after the filing of Commerce's redetermination, and defendant will respond within 10 days after the filing of plaintiff's comments.

So ordered.