**NORTH STAR STEEL OHIO, A DIVISION OF NORTH STAR STEEL COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Siderca, S.A.I.C., Defendant-intervenor.**

No. 92–01–00025.

United States Court of International Trade.

May 28, 1993.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., John R. Shane, Willis S. Martyn III, Peter S. Jordan, for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Vanessa Sciarra, Steve Powell, Office of the Chief Counsel for Import Administration, U.S. Dept. of Commerce, Michael Liu, for defendant.

Mudge Rose Guthrie Alexander & Ferdon, David P. Houlihan, Gregory J. Spak, for defendant-intervenor.

## MEMORANDUM OPINION

MUSGRAVE, Judge.

Plaintiff North Star Steel Ohio, a division of North Star Steel Company ("North Star Steel"), a domestic producer of oil country tubular goods and a petitioner in the administrative review below, contests certain negative portions of the Final Results of the Countervailing Duty Administrative Review for the period January 1, 1989 through December 31, 1989, concerning oil country tubular goods from Argentina. The Preliminary results were issued by the United States Department of Commerce (the "Department" or "Commerce") on October 9, 1991. 56 Fed. Reg. 50,855. The Final Results were issued on December 2, 1991, and were published in the Federal Register on December 10, 1991. *Oil Country Tubular Goods from Argentina,* 56 Fed.Reg. 64,493 (1991) (final), Pub.R. No. 50 ("1989 Final Results").

The issue of law is whether the Department's methodology for measuring the benefit of a countervailable government loan counterguarantee provided to Siderca S.A.I.C. ("Siderca") is supported by substantial evidence in the record and is otherwise in accordance with the law. This issue has two aspects: 1) whether the Department's determination to measure the countervailable benefit of the Argentine government's counterguarantee as the difference between the guarantee fee Siderca would have paid without the counterguarantee and the guarantee fee Siderca paid with the counterguarantee is reasonable, supported by substantial evidence contained in the administrative record, and in accordance with law and 2) whether the Department's determination to account for the effects of hyperinflation in the Argentine economy on a monthly basis is reasonable, supported by substantial evidence contained in the administrative record, and in accordance with law.

### Background[1]

One June 13, 1984, Lone Star Steel Company and CF & I Steel Corporation filed a countervailing duty petition pursuant to 19 U.S.C. § 1303, alleging that Argentine manufacturers, producers, or exporters of oil country tubular goods were receiving countervailable benefits from the Government of Argentina. 49 Fed.Reg. 28,289. In its final determination, the Department found that loan guarantees provided by the state-owned Banco Nacional de Desarrolo ("BANADE") to Siderca, together with the counterguarantees provided by the Ministry of Economy, were generally available and therefore not countervailable. *Oil Country Tubular Goods from Argentina,* 49 Fed.Reg. 46,564, 46,567 (1984) (final). Petitioner North Star Steel subsequently filed notices of appearance with the Department and participated in the administrative reviews of 1987, 1988, and 1989.

Petitioner alleges that rather than receiving only guarantees, as the Department originally found, Siderca has received a dual guarantee: a BANADE loan guarantee coupled with a *counterguarantee* provided by the Argentine Ministry of Economy on an internationally-funded loan from the Inter–American Development Bank ("IADB"). *See Plaintiff's Brief in support of Plaintiff's Rule 56.1 Motion for Judgement on the Agency Record* at 5 & n. 5 ("*Plaintiff's Brief*"). The Department had not previously reviewed the terms of the IADB financing package because the loan was obtained after the period covered by the 1985 administrative review. The parties agree that the IADB loan was predicated on the condition that Siderca obtain guarantees from both BANADE and the Argentine Ministry of Economy. Petitioner North Star Steel requested an administrative review of the final order for the calendar year 1989 on November 15, 1990. Petitioners alleged again that Siderca had received a company-specific subsidy arising from the BANADE guarantee and counterguarantee from the Ministry of Economy. *Plaintiff's Brief* at 7. Commerce initiated an administrative review for calendar year 1989 on December 17, 1989. 55 Fed.Reg. 51,742. The focus of the investigation was the guarantee terms of a 40–million

---

1. References to documents contained in the public administrative record are cited, in accordance with the certified index, as "P.R. __." References to documents contained in the proprietary (confidential) record are cited as "C.R. __."

dollar loan extended in 1986 to Siderca by the IADB.

At the time the IADB demanded the dual guarantee for its loan participation, the Argentine government had stopped providing such joint benefits. *Plaintiff's Brief at 6.* Since the joint benefits of the guarantee and the counterguarantee were no longer generally available, Petitioners argued that the BANADE guarantee and Ministry of Economy counterguarantee conferred a countervailable benefit on Siderca.

Commerce determined that two guarantees were extended on the loan: BANADE provided the primary guarantee of the loan in its capacity as a commercial bank and the Argentine Ministry of Economy provided a second guarantee or counterguarantee. The counterguarantee was an agreement between BANADE and the Ministry of Economy which provided that the Ministry of Economy would reimburse the primary guarantor, BANADE, for its repayment of the IADB loan if Siderca defaulted on its obligations to the IADB. *P.R. 39* at 708. BANADE's commercial guarantee rate to Siderca, without the government counterguarantee, was [ ] percent of the loan's principal balance. As a result of the Ministry's counterguarantee of the IADB loan, BANADE reduced its guarantee fee to Siderca by [ ] percent from [ ] percent to [ ] percent. *C.R. 4* at 8.

Commerce also determined that the government's counterguarantee was a prerequisite for the IADB loan. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record* at 6 ("Defendant's Brief"). In its loans to private borrowers, the IADB could require the guarantee of the borrower's government,[2] and in fact did.[3] Thus, even given Siderca's strong financial condition and the feasibility of the expansion project, the IADB would not have extended the loan to Siderca without the Ministry of Economy's counterguarantee. Commerce determined that the BANADE guarantees were not countervailable. 56 Fed.Reg. 50,857.

**2.** *See P.R. 32* (optional conditions for loans).

**3.** *See C.R. 5* at 309 (containing "Suspension of Financing and Accelerated Maturity" provisions of IADB–Siderca Contract); *C.R. 5* at 287 (Minis-

However, with respect to the Ministry of Economy counterguarantee, Commerce determined that the counterguarantees were subsidies pursuant to 19 U.S.C. § 1677(5)(A)(ii)(I). Commerce found that the counterguarantee was provided to a specific enterprise, industry or group. 56 Fed. Reg. 50,857. In addition, Commerce found that Siderca was not charged a fee for the counterguarantee, despite the fact that a fee is usually charged for a loan guarantee in Argentina. Commerce therefore concluded that the Government of Argentina took an action that was inconsistent with commercial considerations. *Id.*

Commerce calculated the countervailable benefit provided by the counterguarantee as the difference between the guarantee rate BANADE would have charged Siderca without the counterguarantee and the actual rate BANADE charged to Siderca as a result of the counterguarantee. *Id.* Commerce then multiplied the difference of the two BANADE rates by the loan balance in December 1989, when the guarantee payment for the review year was made, to calculate the actual amount of the guarantee fee. This amount, in turn, was divided by Siderca's total sales for the year, adjusted on a monthly basis to reflect inflation. The benefit from the counterguarantee was thus 0.04 percent *ad valorem. Id.* Overall, Commerce found that the value of the Government of Argentina's countervailable subsidies to Siderca was 0.36 percent, *ad valorem,* a *de minimis* rate under 19 C.F.R. § 355.7. *Id.* This position was reaffirmed in the final results. 56 Fed. Reg. 64,493.

### Standard of Review

The Court recognizes the traditional standard of review as set forth by defendant. *See Defendant's Brief* at 8–9. The Court will uphold the agency's findings if they are reasonable conclusions based on substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B) (1980 & Supp.1993); *Chemical Products Corp. v.*

try of Economy states that its counterguarantee was "an indispensable prerequisite for the creditor [IADB] to provide the financing").

*United States*, 10 C.I.T. 626, 628, 645 F.Supp. 289, 291 (C.I.T. 1986). Moreover, "Substantial deference is granted to the agency in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law." *Id.* (citations omitted).

### Discussion

This case is about the scope and definition of a subsidy, and whether and to what extent it should be countervailed. The search for an exact definition of a subsidy is elusive because, in the largest sense, any benefit (*e.g.,* publicly financed education) can be viewed as a subsidy. So far, the imagination of governments has outpaced the trade statutes when it comes to discovering new ways of conferring these benefits. At some point, the Administration exercises its discretionary policy-making power to choose a point past which it will not countervail a subsidy. To do otherwise would invite chaos, trade wars, and quite possibly would contravene important public policies.

The fact that world lending institutions have been established to assist less-advantaged countries or otherwise facilitate uniform world development, and the fact that concessions for "unfair" trade have been built into U.S. trade programs (*e.g.,* Generalized System of Preferences or the Caribbean Basin Initiative) and the G.A.T.T. (*e.g.,* infant industry provisions) is indicative that every subsidy need not necessarily be a countervailable subsidy. Rather, governments including the United States have consciously chosen to confer benefits such as the IADB loan programs on certain eligible countries.

With the above-stated caveat, plaintiff's description of the countervailing duty law is accurate. Its purpose is to offset competitive advantages conferred through government intervention in the marketplace. Whenever a country subsidizes the manufacture, production, or export of any article produced in such country, then a duty equal to the net amount of such subsidy shall be levied upon the importation of such article into the United States. *See* 19 U.S.C. § 1303(a)(1) (1980 & Supp.1993). The statutory definition of a subsidy includes the provision of loan guar-antees on terms inconsistent with commercial considerations, if provided to a specific enterprise or industry or group of enterprises or industries. *See* 19 U.S.C. § 1677(5)(A)(ii)(I) (1980 & Supp.1993); *see also, Plaintiff's Brief* at 12.

■ Plaintiff asserts that the Department's valuation methodology deviated from established precedent and did not account for the full value of the benefit received by Siderca. Rather than calculating the countervailable benefit provided by the counterguarantee on the IADB loan as the difference between the guarantee rate BANADE would have charged Siderca without the counterguarantee and the actual rate BANADE charged to Siderca as a result of the counterguarantee, plaintiff urges that the correct methodology would have been to compare the value of the IADB loan rate and a comparable commercial loan benchmark.

Commerce's proposed regulations provide guidelines for the valuation of countervailable loan guarantees. *See Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments,* 54 Fed.Reg. 23,366 (May 31, 1989) (Proposed Regulations), § 355.44(c)(1). Section 355.44(c)(1) of the Proposed Regulations states as follows:

(c)(1) **Loan guarantees.** In the case of an explicit guarantee by a government of a loan to a firm, a countervailable benefit exists to the extent the Secretary determines that:

(i) The price or fee paid by the firm for the government guarantee is less than the price the firm would have paid for a comparable commercial guarantee, or

(ii) The amount paid by the firm for the guaranteed loan is less than what the firm would have paid for benchmark financing pursuant to paragraph (b) of this section.

Commerce contends that only when it is unable to find a comparable commercial guarantee rate (option (c)(1)(i)) will Commerce measure the subsidy provided by a loan guarantee as the difference between the total cost of the guaranteed loan and the total cost of a comparable commercial loan (option (c)(1)(ii)). *See Defendant's Brief* at 11–12; *Final Affirmative Countervailing*

*Duty Determination: Certain Stainless Steel Hollow Products From Sweden,* 52 Fed.Reg. 5,794, 5,796 (Feb. 26, 1987) (documentation on loan guarantee fees charged by commercial banks during period in which loan guarantees were received was not available); *Final Affirmative Countervailing Duty Determination: Certain Fresh Cut Flowers From the Netherlands,* 52 Fed.Reg. 3,301, 3,306 (Feb. 3, 1987) (during verification Commerce found that no commercial loan guarantees were available in the Netherlands). In this case, documentation regarding the usual fee charged by the commercial bank, BANADE, was available; it was [ ]. Therefore, Commerce maintains that the application of subsection (c)(1)(i) was appropriate.

The parties do not disagree that the guarantee provided by the Government of Argentina was actually a counterguarantee to a primary guarantee provided by BANADE. Commerce determined that a fee of [ ] percent was normally paid by Siderca to BANADE from a commercial guarantee, absent any counterguarantee from the Government of Argentina. *See C.R. 4* at 7–8. Thus, when the Ministry of Economy did not provide a counterguarantee to Siderca, the company's commercial alternative was to pay the full amount of the guarantee fee in order for BANADE to guarantee a loan. 56 Fed.Reg. 64,496. Because the counterguarantee significantly decreased BANADE's credit risk on the loan, BANADE decreased the fee on its own guarantee to Siderca from [ ] percent to [ ] percent. *C.R. 4* at 8.

Pursuant to subsection (i) of the Proposed Regulations, Commerce determines whether any benefit derives from "the price or fee paid by the firm for the government guarantee" as compared to a comparable commercial guarantee fee. In this case, Commerce found that the effective benefit to Siderca of the government's counterguarantee was [ ] percent, or the decrease in Siderca's total dual guarantee package fee. 56 Fed.Reg. 64,496. This amount, in turn, was determined to the actual benefit received by Siderca as a result of the Argentine government's preferential treatment of the company.

North Star argues that the methodology described by subsection (ii) of the proposed regulation should have been used because there was really no comparable commercial guarantee for the Ministry of Economy guarantee. The IADB insisted that the government provide the counterguarantee as a prerequisite of the loan. Thus no other commercial counterguarantee was available.

Without the counterguarantee, the only commercial alternative available to the company was to borrow funds on the commercial market. Therefore, plaintiff argues, the full value of the benefit received by Siderca includes the lower interest rate on the IADB loan as well as a reduced BANADE guarantee fee.

In a sense, both defendant and plaintiff are correct. Defendant accurately observes that the benefit of the government counterguarantee is measurable in the reduced fee paid on the BANADE guarantee. Plaintiff accurately points out that, strictly speaking, there is no "comparable" commercial guarantee because that guarantee must be governmental for Siderca to qualify for the loan. Therefore, under the proposed regulations, Commerce would be entitled to apply subsection (ii) as well as subsection (i).

In response, defendant asserts that the purpose of Commerce's inquiry is *"not* to establish that there is a practical commercial alternative available to the government's countervailable action in a particular case at issue. Instead, Commerce seeks to find a reliable benchmark to value the benefit of the subsidy." *Defendant's Brief* at 15. According to Commerce, to the extent that the Argentine Government's counterguarantee measurably decreased the fee charged for the BANADE guarantee, the methodology of subsection (i) satisfied Commerce's inquiry and was therefore appropriate.

■ As noted above, this Court grants substantial deference to the agency in the methods it employs in administering the antidumping and countervailing duty law. Furthermore, in determining whether to sustain the agency's construction of the countervailing duty statute or regulations, the Court need not find Commerce's interpretation to be the only reasonable one, or even the one

that the Court views as most reasonable. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). Thus, based on the limited review available, the Court is unable to hold that Commerce's reasonable choice among two alternatives set forth in proposed regulations was not in accordance with law or that Commerce's choice of methodology is unsupported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(1)(B) (1982 & Supp. 1992).

From a theoretical standpoint, the IADB loan may be viewed as a subsidy. Commerce, however, had compelling reasons to employ the methodology of subsection (i) of its proposed regulations, thereby not countervailing the IADB loan.

First, the Department "does not consider loans provided by international lending institutions to be countervailable under U.S. countervailing duty law...." 56 Fed.Reg. 64,496; 56 Fed.Reg. 50,856–57; *See also Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Certain Fresh Cut Flowers from Ecuador,* 52 Fed.Reg. 1365 (January 13, 1987). According to the Department, under section 701(a) of the Act, the Department must determine whether "a country under the Agreement" or "a person who is a corporation, association, or other organization organized in such a country" is providing a subsidy with respect to a class or kind of merchandise. *See Final Affirmative Countervailing Duty Determination: Fuel Ethanol From Brazil,* 51 Fed.

Reg. 3361–75 (January 27, 1986) ("Ethanol From Brazil") (World Bank found not to be a "country" under the Agreement); 19 U.S.C. § 1671(b) (1982 & Supp.1993).[4] Presumably, Commerce used the same analysis in this case as it did for the World Bank in *Fuel Ethanol From Brazil,* determining that the IADB was not a country under the Agreement, and thus not subject to U.S. countervailing duty law.

This determination is consistent with the purpose of the countervailing duty law, which is "intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from ... subsidies paid by *their governments.*" *Zenith,* 437 U.S. 443, 456, 98 S.Ct. at 2448 (emphasis added). As in *Fuel Ethanol From Brazil,* Commerce in this case was "careful to distinguish the countervailable benefit accruing directly from the government's action from the benefits to the borrower extended by the international lending institution." *Defendant's Brief* at 20. The Court finds that this was a reasonable approach, consistent with the law and long-standing policy of the Department.

One of the main goals of the U.S. countervailing duty law is to curb the behavior of foreign governments and provide compensation for U.S. companies injured by unfair trade by rebalancing the scales of competition with duties. Two important factors distinguish the IADB loan in this case. As stated above, the IADB is not a country under the Agreement.[5] Second, the IADB

---

4. Argentina was not a country under the Agreement on Subsidies and Countervailing Measures, to which 19 U.S.C. § 1671(b) applies. Therefore, in the 1984 countervailing duty investigations involving merchandise from Argentina, the International Trade Commission was not required to make a domestic industry injury determination.

For the purpose of whether the World Bank or the IADB were countries under the agreement, the language of sections 1671(b) and 1303 is similar enough that the outcome of the analysis is the same under either section. Both sections are aimed at a country or groups organized in that country. The IADB was not organized in Argentina nor can it be viewed as representing any single country so the Department's position that it is not a "country" under the Agreement is reasonable.

5. 19 U.S.C. § 1671(b) states in part:

(a) **General Rule**
if—
(1) the administering authority determines that—
(A) a country under the Agreement, or
(B) a person who is a citizen or national or such a country or a corporation, association, or other organization organized in such a country [is providing a subsidy] ...

\*   \*   \*   \*   \*   \*

(b) **Country under the Agreement**
For purposes of this part, the term "country under the Agreement" means a country—
(1) between the United States and which the Agreement on Subsidies and Countervailing Measures applies, as determined under section 2503(b) of this title,
(2) which has assumed obligations with respect to the United States which are substantially

loan, including the terms and benefits, was not within the purview of the Argentine Government's behavior or control.

In addition, loans from international lending institutions such as the World Bank or the IADB, are purposely conceived benefits provided by the international community, including the United States. Thus, in a sense, North Star asks the United States Government to work at counter purposes to itself, giving with one hand while it takes with the other. The Department policy of pursuing the application of countervailing duties against foreign governments that confer unfair benefits rather than against the United States Government, when it confers a benefit (*albeit* indirectly), is sound. The common thread is that in both instances the Administration retains a measure of control over what benefits accruing to foreign producers are acceptable to it.

Plaintiff recognizes that neither the Department nor the Court has ever directly countervailed loans from an international lending agency. *Plaintiff's Brief* at 17. Meanwhile, plaintiff engages in a sophisticated game of semantics to urge that very result on the Court. Plaintiff proposes several methodologies that would lead to the result that loans from international agencies which may give foreign producers a competitive advantage will be countervailable pursuant to American domestic law.

North Star's proposal that the value of the countervailable benefit provided by the Argentine Government should be computed by comparing the difference in interests rates on the IADB loan to Siderca's average interest charge on sample outstanding long-term loans without counterguarantees during 1987 is one such technique. Were Commerce to employ this otherwise reasonable methodology, it would directly counteract its policy of not countervailing loans from international lending institutions. North Star's other ar-

guments are similarly flawed and without merit.

North Star cites several cases in support of its argument that the total cost of a comparable loan package should be the standard of comparison for valuation purposes. As defendant points out, however those cases involved circumstances where there was no evidence of commercial guarantees for the purposes of comparison in the country subject to investigation. *See supra* at 9. No party in this case disputes that BANADE is a commercial bank, charging commercial rates that were generally available in Argentina.

Moreover, BANADE's annual reports indicate that the guarantee rate without the Ministry of Economy's counterguarantee is an actual rate, not a *pro-forma* rate. The annual reports list revenues from guarantee fees which were offered without the Ministry's counterguarantee. *C.R. 5* (Attachment 4); *Defendant's Brief* at 16 n. 9. Therefore, evidence of Argentine commercial rates with and without counterguarantees was eminently available in Argentina, rendering North Star's proposed methodology unnecessary with respect to the value of the counterguarantee.

Another situation in which Commerce compares the total costs of loan packages to value a loan guarantee is when Commerce determines that a company is uncreditworthy. *See Proposed Regulations,* 19 C.F.R. § 355.44(b)(6)(i); *Defendant's Brief* at 17 & n. 10. There was no allegation that Siderca was an uncreditworthy company. Rather, Siderca has demonstrated strong financial strength.[6]

North Star contends that Siderca was literally uncreditworthy to the extent that no matter what its financial strength, it could not obtain the IADB loan without the government counterguarantee from Argentina. This Court holds that Commerce's choice of a

---

equivalent to obligations under the Agreement, as determined by the President

. . . . .

Nowhere in the Statute is it provided that an international lending institution shall be considered a country under the agreement and plaintiff has not contended as much.

6. *See* Siderca's audited financial statements for the financial years ending March 31, 1990 and March 31, 1989. *P.R. 24* (Attachment 1); *see also P.R. 38* (Attachment 2) (IADB feasibility report for Siderca's plant expansion).

financial approach to the analysis, rather than the situational approach urged by plaintiff, was reasonable and within its discretion in this case. Once again, that choice was also in harmony with the Department's important policy of not countervailing loans from international lending institutions.

### Hyperinflation [7]

North Star asserts that, even if Commerce utilized the correct methodology to value the benefit Siderca received from the counterguarantee, Commerce erred in applying the valuation methodology because Commerce did not adequately account for hyperinflation.

Siderca paid a guarantee fee [ ] percent to BANADE on December 7, 1989. *See C.R. 4* at 8. The fee was denominated in U.S. dollars. This payment was made in the last month of the review period which spanned the calendar year of 1989. In order to measure the actual value of the payment, the Department converted the BANADE guarantee fee from dollars to Argentine australs at the exchange rate prevailing on December 7, 1989. 56 Fed.Reg. 64,493, 64,496. The agency then divided this figure by the company's total sales, which Siderca had adjusted for inflation through the end of December according to a published monthly inflation index.

Plaintiff claims that the Department failed to adjust the BANADE guarantee fee for inflation from December 7, 1989, to December 31, 1989.[8] According to plaintiff, this failure was not reasonable in view of the extreme hyperinflationary period characterized by massive daily inflation rates in Argentina during this review. Rather, plaintiff would impose on the Department to adjust the value of the guarantee fee to reflect the impact of inflation on a daily or weekly basis between December 7, and December 31, 1989. North Star determined that the inflation rate for the month of December 1989 was 40.07 percent. *See Plaintiff's Brief* at 19 n. 32. Plaintiff calculates that the prorated inflation from December 7 to December 31, 1993 was 31.02 percent.

Plaintiff contends that adjusting for inflation "results in a benefit of 0.0512 percent from the reduced BANADE guarantee fee. *Plaintiff's Brief* at 20. Thus, plaintiff argues, "the total benefit of this counterguarantee, represented by the difference between the *total* cost of the two financing packages equals 0.464 percent plus the BANADE guarantee benefit of 0.0512 percent ..." for a total of 0.5152. *Id.* at 20. Use of plaintiff's methodology increases the countervailing duty from a *de minimis* rate of 0.36 percent *ad valorem* to 0.84 percent *ad valorem*. Plaintiff argues that since this correction raises the countervailing duty rate above a *de minimis* amount, the Department's failure to utilize the appropriate valuation methodology materially affects the countervailing duty rate established for this administrative review.

This Court has held above, however, that Commerce acted reasonably in *not* countervailing the IADB loan portion of the benefit accruing to Siderca, thus eliminating the "0.464" percent from plaintiff's calculations. Therefore, even if the Court were persuaded by plaintiff's argument on hyperinflation, the 0.0512 percent attributable to it by plaintiff's own calculations, when added to the 0.36 percent found by the Department, does not rise above the 0.5 *de minimis* rate. Accordingly, the Court need not and will not reach the issue of an adjustment for hyperinflation. Commerce's decision not to countervail the subsidies granted to Siderca because they fell below the *de minimis* rate was based on substantial evidence and otherwise in accordance with law. Judgment is for defendant. This case is dismissed.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

---

7. Hyperinflation is extreme inflation, usually over 100 percent per year, and is characterized by a devaluation of the currency. *See* Paul A. Samuelson & William D. Nordhaus, *Economics* 81, 975 (13th ed. McGraw–Hill Book Co.) (1989).

8. *Plaintiff's Brief* at 19, *citing* International Monetary Fund, *International Financial Statistics*, at 95 (May 1990) (basis for plaintiff's estimation of percentage of inflation).

ORDERED, ADJUDGED, and DE-CREED: that the determination of the United States Department of Commerce is affirmed; and it is further

ORDERED, ADJUDGED, and DE-CREED: that this action be and the same hereby is dismissed.